IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Angernette Jacobs,<br><br>　　　　*Plaintiff,*<br><br>　v.<br><br>City of Philadelphia, et al.,<br><br>　　　　*Defendants.* | CIVIL ACTION<br>NO. 23-1880 |

**Pappert, J.**　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　April 2, 2025

## MEMORANDUM

　　Angernette Jacobs — originally counseled but now proceeding *pro se* — sued the City of Philadelphia and numerous Philadelphia police officers under 42 U.S.C. § 1983 for false arrest, malicious prosecution and inadequate medical care. She contends that she was arrested and charged because she was mistaken for her daughter, as the two of them look "very much alike," and then ignored while she suffered an epileptic seizure in the Police Detention Unit.

　　The Court previously dismissed all claims against the City pursuant to Rule 12(b)(6), and the individual defendants now move for summary judgment on the remaining claims. Jacobs seeks summary judgment as well.[1] The Court grants the Defendants' motion in part and denies Jacobs's. There are genuine disputes of material fact with respect to whether there was probable cause to arrest and charge Jacobs, but no reasonable juror could conclude that any of the Defendants were personally involved in violating Jacobs's right to medical care during her detention.

---

[1] The Defendants never filed a response to Jacobs's Motion, but the Defendants have addressed, in their briefs in support of their own motion, everything raised in Jacobs's motion.

1

I

A

Jacobs was arrested for her alleged role in a "road rage incident" that occurred on June 11, 2022. *See* (Aff. of Probable Cause, ECF No. 34-4); *see* (Am. Compl. ¶ 10, ECF No. 13.) TM was driving with her daughters in Center City Philadelphia when she nearly collided with another car and then laid on her horn. *See* (Aff. of Probable Cause.) The driver of the other car followed TM to a red light before getting out and approaching TM's car to curse at her and her daughters, give them the middle finger and spray Sprite at them. (*Id.*); (Statement of TM, ECF No. 34-1.) TM drove away when the light turned green, but the other driver continued to follow in her own car. (Statement of TM.) The driver caught up again, walked up to the passenger side of TM's car where her daughter LM was sitting, reached through the window, and pulled LM's hair. (*Id.*)

TM again drove away, but the driver once more caught up at a red light and approached the vehicle. (*Id.*) This time, the driver was accompanied by a male passenger. (*Id.*); (Statement of LM, ECF No. 34-3.) LM and TM disagreed about whether the driver was also accompanied by a female passenger — LM says there was a female passenger while TM says there was not. (Statement of LM); (Statement of TM.) Both agree that a female — TM says it was the driver, LM says it was the female passenger — smashed their back windshield. (Statement of LM); (Statement of TM.)

TM and LM gave the above accounts to Detective James Koenig. *See* (Statement of LM); (Statement of TM.) They also gave Koenig a photograph taken during the events depicting a person standing outside of TM's car holding a bottle of Sprite, and

2

they told Koenig that the person in the photograph was the driver of the other car. (Statement of LM); (Statement of TM.) The person in the photograph, we now know, was Jacobs's daughter Alecia Jacobs-Alsbrooks.[2] *See* (Def. Mot. for Summ. J at 3 n.1.) In addition to the photograph of Jacobs-Alsbrooks, LM and TM gave Koenig a photograph of the car Jacobs-Alsbrooks was driving (a gray Chevrolet Malibu) and its license plate. (ECF No. 34-2.) This enabled Detective Koenig to retrieve records from the Pennsylvania Bureau of Motor Vehicles showing that Jacobs and Jacobs-Alsbrooks co-owned the car. (ECF No. 34-5.)

Around two hours after TM and LM gave their original statements, Detective Robert Williams asked TM and LM to identify the perpetrators in photo arrays. Williams gave TM one photo array, which contained Jacobs's driver's-license photo and five filler photos. (Statement of TM); (Photo Arrays, ECF No. 34-8.) TM identified Jacobs's photo and said she was the driver of the gray Malibu, (Statement of TM), contradicting her earlier statement that the picture of Jacobs-Alsbrooks holding a Sprite bottle depicted the driver. He gave LM the same photo array, who also contradicted her earlier statement and identified Jacobs as the driver. (Statement of LM); (Photo Arrays.) Williams then gave LM a second array, this one featuring Jacobs-Alsbrooks's driver's-license photo and five filler photos. (Statement of LM); (Photo Arrays.) LM picked out the photo of Jacobs-Alsbrooks and identified her as the female passenger who LM believed smashed the back windshield. (Statement of LM); (Photo Arrays.)

---

[2] The filings also refer to Jacobs's daughter as Alecia Jacobs, Alecia Jacobsalsbrooks and Alecia Alsbrooks. The Court uses "Jacobs-Alsbrooks" because that is the name that appears on her Driver's License. *See* (ECF No. 34-6.)

Using this information, Koenig drafted an affidavit of probable cause.[3] (Aff. of Probable Cause.) The affidavit accurately recited LM and TM's account of the events and their photo-array identifications. (*Id.*) But it incorrectly states that the person

---

[3] The full affidavit reads:

On 6-11-22, the complainants TM and LM were interviewed and relayed the following summary. On 6-11-22 in and around the area of 17th and Chestnut St., the complainants exited a parking garage after leaving their hotel. As TM, the driver, turned on 17th street a vehicle almost struck her vehicle. TM honked the car horn and continued to the light at 17th and Chestnut St. While at the red light the defendant #1 exited the vehicle and went to the passenger window where LM was sitting. The defendant #1 had a bottle of Sprite in her hand and started spraying LM. The defendant #1 went to the driver's side where TM was sitting and sprayed the Sprite at her and hit the window with the bottle. The light changed and TM drove off. The defendant got back into her car and followed the complainants. The defendant #1 was able to catch up with the complainants and got out of her car and went to the side where LM was. The window was slightly down and by accident LM lowered the window. The defendant #1 reached in the vehicle and grabbed LM by the hair pulling her head in different directions. TN again drove off and turned onto Walnut Street. Because of a red light and a double parked vehicle the complainant could not move. The defendant #1, an unknown male and the defendant #2 got out of the vehicle. The unknown male began punching the rear window multiple times. The defendant #1 started punching the windows also. The defendant #2 began striking the rear windshield with a metal rod multiple times until the rear windshield was shattered. The defendants then fled the area. Several people on the street took pictures and a video of the defendant's car and of the unknown male. The picture of the vehicle captured the tag. A picture of the defendant #1 was taken with the Sprite bottle in her hand.

The assigned did a BMV check on the vehicle PA# LWE0857 on a gray Chevrolet Malibu. The vehicle was registered to Alecia Jacobs Alsbrooks the defendant #2 and Angernette Jacobs the defendant #1. Detective Williams #760 of CDD showed TM and LM photo arrays and the defendant #1, Angernette Jacobs 12-27-1965 was identified by both complainants. The defendant #2 Alecia Jacobs Alsbrooks 03-11-1997 was positively identified by LM. TM did not notice the defendant #2 due to the punching of the windows by the defendant #1 and the unknown male.

The vehicle had a shattered rear windshield and a dent and scratches to the side. LM complained of head pains from getting her hair pulled. The complainants were distraught over being followed several times and the defendants banging and shattering the window.

photographed holding the Sprite bottle was Jacobs.[4]  (*Id.*)  A judge issued a warrant for Jacobs's arrest pursuant to the affidavit.  *See* (Arrest Report, ECF No. 34-9.)

B

Jacobs was arrested, along with Jacobs-Alsbrooks, and taken to the Police Detention Unit on the evening of June 20, 2022.  (Arrest Report); (Prisoner Flow Chart, ECF No. 34-10.)  Shortly after she arrived at the Detention Unit, Jacobs completed medical screening and a checklist, stating that she suffers from epilepsy and takes medication to treat it.  (Detainee's Medical Checklist, ECF No. 34-11); (YesCare Receiving Screening, ECF No. 34-12.)  Detention Unit records reflect that Jacobs received a 500mg dose of Depakote at 7:00 a.m. on June 21 pursuant to a doctor's order.  (YesCare Receiving Screening); (Telephone/Verbal Order, ECF No. 34-13.)  Though she stated in her Complaint and deposition that she did not receive any medication,[5] she now agrees that she did receive the Depakote.  *See* (Am. Compl. ¶¶ 37–39); (Jacobs Dep. 27:11–14, ECF No. 34-14); (Pl.'s Resp. in Opp. to Def.'s Mot. 8, ECF No. 35.)

Jacobs maintains that at some point (she cannot remember exactly when) between her arrival at the Detention Unit on the evening of June 20 and her release on June 21, she suffered a seizure.  (Jacobs Dep. 27:18–21, 28:3–5, 29:2–4.)  She says the seizure caused her to urinate on herself and suffer injuries to her back and neck.  (*Id.* at 27:22–28:2, 29:7–22.)  She also says that she told someone she wasn't feeling well prior to her seizure and that during her seizure, her daughter (who was in the cell with her)

---

[4]  The Defendants fail to contend with — or even recognize — that Koenig misstated the identity of the person photographed holding Sprite, though they do acknowledge that Jacobs-Alsbrooks is the person in that photograph.  *See* (Def. Mot. for Summ. J. at 3 n.1.)

[5]  She also testified that she did not remember undergoing any medical screening upon arrival at the Detention Unit, but she now agrees that she did.  (Jacobs Dep. 25:5–7, 27:15–17); (Pl.'s Resp. in Opp. 8.)

called out for help but no one came. (*Id.* at 28:5–14.) Jacobs does not remember the names or any physical characteristics of any of the officers with whom she interacted during her time at the Detention Unit, though she does recall that she interacted with at least two of them. (*Id.* at 28:15–29:1, 32:8–33:24.) A Detention Unit assignment sheet shows that from 11:00 p.m. on June 20 to 7:00 a.m. on June 21, Officers Mosee and Thornton were assigned to the female cells, Officers Sarp and Hoerst were assigned to "ctrl point," and Officer Brown was assigned to "floor/prpy." (Assignment Sheet June 21, 2021, ECF No. 34-15.) Another sheet shows that from 7:00 a.m. to 3:00 p.m. on June 21, Officers Aponte and Card were assigned to the female cells, Officers Manning and Avery were assigned to "cont. point," Officer Thornton was assigned to "floor prop," and Officer Hoerst was assigned to "PARS." (*Id.*) The record does not contain any description of the various job assignments.

C

The Commonwealth eventually dropped all charges against Jacobs. (*Id.* at 34:2–35:18); (Docket Summ., Ex. 1 to Pl.'s Mot. for Summ. J., ECF No. 37.) Represented by an attorney, she filed this lawsuit in May of 2023, alleging various constitutional violations and seeking damages pursuant to § 1983. *See* (Compl., ECF No. 1.) The Court dismissed her claims against the City, so Jacobs's remaining claims are for (1) false arrest against Detectives Koenig and Williams, (2) malicious prosecution against Koenig and Williams, and (3) inadequate medical care against the nine officers who were on duty at the Detention Unit during at least part of Jacobs's time there. *See* (Am Compl., ECF No. 13); (Dismissal Order, ECF No. 18.)

A few months after discovery began, Jacobs's lawyer requested permission to withdraw. (Mot. to Withdraw, ECF No. 24.) Counsel said Jacobs asked him to do so because, among other things, he refused to add new claims that he believed to be frivolous and expressed discontent with the participation of a nonlawyer named Bob Alsbrooks in the case. (*Id.* ¶¶ 3–13.) After holding a hearing, the Court permitted counsel to withdraw and gave Jacobs two months to find new counsel. (Order Granting Mot. to Withdraw, ECF No. 27.) When Jacobs's deadline passed, the Court held a status conference and Jacobs affirmed that she would be proceeding *pro se*. (Minute Entry, ECF No. 30.) The Court then entered new case deadlines and gave the parties two months to finish discovery. (Am. Sched. Order, ECF No. 31.)

The Defendants moved for summary judgment after discovery concluded. In addition to responding to the Defendants' motion, Jacobs also sought summary judgment and filed motions to compel both the Defendants and her prior counsel to produce various documents, images and videos. *See* (ECF Nos. 35, 37, 38, 39.) The Defendants responded that they had produced all the requested materials previously. *See* (Def. Resp. in Opp. to Pl.'s Mot. to Compel 2–3.) And Jacobs's prior counsel agreed to send Ms. Jacobs copies of all the materials in her case file. (ECF No. 45.) The Court permitted Jacobs to file a supplemental response in opposition to the Defendants' summary judgment motion after receiving the file from her prior counsel. (ECF Nos. 44, 49.)

II

Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a); *Liberty Mut. Ins. Co. v. Sweeney*, 689 F.3d 288, 292 (3d Cir. 2012). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party." *Id.*

The movant bears the initial burden of demonstrating the absence of a genuine dispute of a material fact. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016). If the movant meets this initial burden, "the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). At the summary judgment stage, the Court's role is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249; *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). In doing so, the Court must construe the facts in the light most favorable to the non-moving party. *See Horsehead Indus., Inc. v. Paramount Commc'ns, Inc.*, 258 F.3d 132, 140 (3d Cir. 2001).

III

Jacobs's claims all arise under § 1983. Evaluation of those claims proceeds in two steps. First, the Court must "identify the exact contours of the underlying right" and determine whether the plaintiff was deprived of that right. *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015). Second, the Court must determine whether the plaintiff has adduced evidence of each individual defendant's "personal

involvement in the alleged wrongs." *Id.*  A defendant who did not actually participate in the wrongful conduct may only be liable if the defendant (1) was a policymaker who promulgated an unlawful policy that caused the deprivation of the plaintiff's right, or (2) either "directed" the deprivation or, "as the person in charge, had knowledge of and acquiesced" in the deprivation. *A.M. v. Luzerne County Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004).

## A

To succeed on her Fourth Amendment false-arrest claim against Detective Koenig,[6] Jacobs must establish that there was no probable cause to arrest her for any of the crimes with which she was charged and that Koenig participated in the arrest. *Harvard v. Cesnalis*, 973 F.3d 190, 199 (3d Cir. 2020).  "Probable cause exists if there is a fair probability that the person committed the crime at issue." *Id.* (internal quotation marks omitted).  More specifically, an officer has probable cause to arrest when the facts of which he has knowledge would "warrant a reasonable person to believe that on offense has been . . . committed by the person to be arrested." *Id.* at 199–200 (internal quotation marks omitted).

Because Jacobs was arrested pursuant to a warrant, the Court would normally defer to the warrant-issuing judge's determination of probable cause. *Pinkney v. Meadville, Pennsylvania*, 95 F.4th 743, 748 (3d Cir. 2024).  The Court won't defer,

---

[6]  She also asserts this claim against Detective Williams, but it fails on personal-participation grounds.  The alleged constitutional violation is Jacobs's arrest without probable cause.  But the record shows that Williams's role was confined to administering the photo arrays. *See* (Photo Arrays.)  Jacobs has not argued that the photo arrays were improperly conducted, and nothing in the record suggests that Williams assisted with the affidavit of probable cause or otherwise contributed to the decision to arrest Jacobs. *Cf. Halsey v. Pfeiffer*, 750 F.3d 273, 297 (3d Cir. 2014) (only officers who "influenced or participated in the decision to institute criminal proceedings . . . can be liable for malicious prosecution.")

however, if (1) in his affidavit of probable cause, Detective Koenig made false statements and/or omissions with at least "a reckless disregard for the truth," and (2) those misstatements and/or omissions were "material," meaning "necessary to the finding of probable cause." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 468–69 (3d Cir. 2016) (cleaned up).

1

Detective Koenig's affidavit contains at least one false statement. It says that Jacobs is the woman who was photographed standing outside TM's car holding a bottle of Sprite. *See* (Aff. of Probable Cause.) The person in the photo is Jacobs-Alsbrooks. *See* (Def. Statement of Undisputed Facts ¶ 19.) The affidavit also omits a fact. It does not disclose that both LM and TM told Koenig that the person in that photograph was the driver of the gray Malibu — i.e., the person who sprayed Sprite at them, pulled LM's hair and punched the rear windows. (Statement of TM); (Statement of LM.)

The next question is whether a reasonable juror could find that Koenig made either the misstatement or omission (or both) recklessly. *See Pinkney*, 95 F.4th at 748.[7]

---

[7] There remains some confusion about the standard of review here. In *Reedy v. Evanson*, 615 F.3d 197 (3d Cir. 2010), the Third Circuit Court of Appeals suggested that the initial two-step inquiry — discerning recklessness and then materiality — should be conducted with "scrupulous neutrality" rather than using the "deliberately slanted" summary judgment standard under which a court must view all evidence in the light most favorable to the non-moving party. *Id.* at 214 n.24. But in *Dempsey*, the Court of Appeals apparently applied "scrupulous neutrality" review only at step one (recklessness). *See* 834 F.3d at 468, 470–71, 477. And in more recent opinions, the Court of Appeals has not referenced "scrupulous neutrality" at all, perhaps abandoning that phrase altogether. *See, e.g., Andrews v. Scuilli*, 853 F.3d 690, 697–704 (3d Cir. 2017).

This would be sensible, as the Court of Appeals never clearly explained what "scrupulous neutrality" actually means. *Compare Reedy*, 615 F.3d at 214 n.24 (suggesting that "scrupulous neutrality" requires the court to satisfy itself by a preponderance of the evidence that misstatements were reckless and material before then reviewing the corrected affidavit for probable cause using the typical summary judgment standard) (citing *Wilson v. Russo*, 212 F.3d 781, 787 (3d Cir. 2000)), *with Wilson*, 212 F.2d at 787 (stating that the relevant inquiry at step one is whether a *jury* could find recklessness), *and Dempsey*, 834 F.3d at 477 (stating that relevant inquiry at step two is whether a *jury* could find materiality). Regardless of whether the Court views the record as a "scrupulous

An officer recklessly disregards the truth of an assertion when "viewing all the evidence, [he] must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Andrews*, 853 F.3d at 698. And an officer recklessly omits information if he had knowledge of it and if "any reasonable person would have known that [it] was the kind of thing a judge would wish to know." *Dempsey*, 834 F.3d at 470.

Beginning with the identity of the person in the photograph, a reasonable juror could find that Koenig "had obvious reasons to doubt" whether that person was Jacobs. Specifically, he viewed the driver's-license photos of both Jacobs and Jacobs-Alsbrooks, which he could have compared to the photograph of the perpetrator. *See* (Driver's License Photographs, ECF No. 34-6); (Photo Arrays); (Aff. of Probable Cause.) On the other hand, Jacobs is Jacobs-Alsbrooks's mother and Jacobs admits they "look very much alike," (Am. Compl. ¶ 12), so the driver's-license photos may not make it obvious that Jacobs-Alsbrooks is the one in the picture with the Sprite bottle. The jury can hear Koenig's explanation, compare all the photos and determine whether they created "obvious reasons" for Koenig to doubt the accuracy of his statement that Jacobs was the one depicted.

With respect to Koenig's omission of the fact that LM and TM both said the person depicted with a Sprite bottle was the driver and primary assaulter, a reasonable juror could find that Koenig knew this fact and that a judge would reasonably wish to know it before issuing a warrant. Koenig knew of LM and TM's statements because he's the one who took them. *See* (Statement of LM); (Statement of TM.) And those

---

neutral" or in the light most favorable the non-movant, the issue of probable cause on these facts is a jury question.

statements could have been important to the judge who issued the warrant. Indeed, the key evidence in Koenig's affidavit against Jacobs was LM and TM's identifications of Jacobs as the driver from the photo arrays. *See* (Aff. of Probable Cause.) Those identifications are undermined by LM and TM's earlier-in-time identifications of Jacobs-Alsbrooks as the driver.

2

Koenig's false statements and omissions are only "constitutionally suspect" if they were "material" — that is, "necessary[] to the finding of probable cause." *Pinkney*, 95 F.4th at 749–50. To determine materiality, the Court must first "reconstruct the affidavit by excising the offending inaccuracies and inserting the facts recklessly omitted." *Id.* at 750 (cleaned up). The Court then asks whether a reasonable juror could find, under all the facts in the reconstructed affidavit, that probable cause was absent, keeping in mind that "it will usually be appropriate for a jury to determine whether probable cause existed." *Dempsey*, 834 F.3d at 468 (citations omitted).

The Third Circuit requires district courts to reconstruct the affidavit "word-by-word." *Id.* at 470. The reconstructed affidavit here would have the following changes: The sentence, "[a] picture of the defendant #1 was taken with the Sprite bottle in her hand," should instead say "defendant #2" because Jacobs-Alsbrooks is "defendant #2" in the affidavit. And the affidavit would also include a sentence that says "LM and TM each stated that the person photographed holding a Sprite bottle is the person who drove the other car, sprayed them, and pulled LM's hair." As reconstructed, the affidavit would read:

> On 6-11-22, the complainants TM and LM were interviewed and relayed the following summary. On 6-11-22 in and around the area of 17th and

12

Chestnut St., the complainants exited a parking garage after leaving their hotel. As TM, the driver, turned on 17th street a vehicle almost struck her vehicle. TM honked the car horn and continued to the light at 17th and Chestnut St. While at the red light the defendant #1 exited the vehicle and went to the passenger window where LM was sitting. The defendant #1 had a bottle of Sprite in her hand and started spraying LM. The defendant #1 went to the driver's side where TM was sitting and sprayed the Sprite at her and hit the window with the bottle. The light changed and TM drove off. The defendant got back into her car and followed the complainants. The defendant #1 was able to catch up with the complainants and got out of her car and went to the side where LM was. The window was slightly down and by accident LM lowered the window. The defendant #1 reached in the vehicle and grabbed LM by the hair pulling her head in different directions. TN again drove off and turned onto Walnut Street. Because of a red light and a double parked vehicle the complainant could not move. The defendant #1, an unknown male and the defendant #2 got out of the vehicle. The unknown male began punching the rear window multiple times. The defendant #1 started punching the windows also. The defendant #2 began striking the rear windshield with a metal rod multiple times until the rear windshield was shattered. The defendants then fled the area. Several people on the street took pictures and a video of the defendant's car and of the unknown male. The picture of the vehicle captured the tag. A picture of the **defendant #2** was taken with the Sprite bottle in her hand. **LM and TM each stated that the person photographed holding a Sprite bottle is the person who drove the other vehicle, sprayed them, and pulled LM's hair.**

The assigned did a BMV check on the vehicle PA# LWE0857 on a gray Chevrolet Malibu. The vehicle was registered to Alecia Jacobs Alsbrooks the defendant #2 and Angernette Jacobs the defendant #1. Detective Williams #760 of CDD showed TM and LM photo arrays and the defendant #1, Angernette Jacobs 12-27-1965 was identified by both complainants. The defendant #2 Alecia Jacobs Alsbrooks 03-11-1997 was positively identified by LM. TM did not notice the defendant #2 due to the punching of the windows by the defendant #1 and the unknown male.

The vehicle had a shattered rear windshield and a dent and scratches to the side. LM complained of head pains from getting her hair pulled. The complainants were distraught over being followed several times and the defendants banging and shattering the window.

Under these facts, a reasonable juror could conclude there was no probable cause to arrest Jacobs. The only evidence that Jacobs, rather than Jacobs-Alsbrooks, was the

driver of the gray Malibu is the two witness identifications a juror could deem unreliable. Indeed, both the eyewitnesses first told Koenig that the picture of Jacobs-Alsbrooks holding a Sprite bottle depicted the driver. Only later did they pick Jacobs's photo out of an array and identify her as the driver. And that later identification is supported by no independent evidence, while the earlier identification is independently supported by the fact that Jacobs-Alsbrooks is, as everyone now agrees, the person pictured holding a Sprite bottle.

To be sure, LM believed there was a second female perpetrator and identified Jacobs-Alsbrooks as that perpetrator *via* photo array. A juror might reasonably credit LM's statement that there were two perpetrators and conclude that LM simply mixed up Jacobs-Alsbrooks and Jacobs — which might not be an unreasonable mistake given that Jacobs admits they look alike. Whether the reconstructed affidavit supports a "fair probability" that Jacobs committed the alleged crimes is thus a question for the jury.

B

Jacobs also asserts a malicious-prosecution claim against Koenig.[8] To succeed, she must establish five elements: (1) the defendant initiated a criminal proceeding; (2) the proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of the proceeding. *Halsey*, 750 F.3d at 296–97. The Defendants argue only that no reasonable juror could find an absence of

---

[8] She brought this claim against Detective Williams as well, but the record contains no evidence that Williams "influenced or participated in the decision to institute criminal proceedings." *Halsey*, 750 F.3d at 297. So like the false-arrest claim, this claim fails on personal-participation grounds. *See supra* n.6.

14

probable cause to initiate criminal proceedings against Jacobs. *See* (Def. Mot. for Summ. J. 8–9.) But as explained, a reasonable juror could find that there was no probable cause to arrest Jacobs. And the Defendants have not identified any evidence between Jacobs's arrest and charging that would change the probable-cause analysis.

C

Jacobs also claims that Officers Manning, Avery, Thornton, Sarp, Hoerst, Brown, Mosee, Aponte and Card failed to facilitate adequate medical care at the Detention Unit between her arrest and arraignment. The exact legal standard applicable to this claim is not clear. Jacobs's claim arises from detention between her arrest and her "first appearance before a court" (that is, she was still an *arrestee* and not yet a *pretrial detainee*), so she was entitled to the Fourth Amendment's protections against unreasonable seizures. *DeLade v. Cargan*, 972 F.3d 207, 212 (3d Cir. 2020). At least one circuit holds that the Fourth Amendment requires state actors to respond to an arrestee's medical needs in an objectively reasonable fashion. *Currie v. Chhabra*, 728 F.3d 626, 631 (7th Cir. 2013). Most other circuits hold that the Fourth Amendment does not contain any "right to medical care." *Colson v. City of Alcoa, Tennessee*, 37 F.4th 1182, 1188 (6th Cir. 2022) (collecting cases). The Third Circuit has not taken a clear position on the matter. *See Groman v. Twp. of Manalapan*, 47 F.3d 628, 632–33, 636–37 (3d Cir. 1995) (analyzing an inadequate-medical-care claim by arrestee without identifying the applicable constitutional provision); *Gunter v. Twp. of Lumberton*, 535 F. App'x 144, 149 (3d Cir. 2013) (nonprecedential) (applying the Fourteenth Amendment to arrestee's medical-care claim); *Smith v. Gransden*, 553 F. App'x 173, 177 (3d Cir. 2014) (same).

If the Fourth Amendment does not grant arrestees a right to adequate medical care, then the right to substantive due process under the Fourteenth Amendment does. *Colson*, 37 F.4th at 1187; *Gunter*, 535 F. App'x at 149; *see also DeLade*, 972 F.3d at 210 (explaining that courts cannot resort to substantive due process if a more specific provision applies). But the Fourteenth Amendment legal standard for inadequate-medical-care claims is also unsettled in this circuit. *Thomas v. City of Harrisburg*, 88 F.4th 275, 281 n.23 (3d Cir. 2023), *cert. denied sub nom. Foose v. Thomas*, 145 S. Ct. 141 (2024), *and cert. denied sub nom. Kinsinger v. Thomas*, 145 S. Ct. 141 (2024); *Hightower v. City of Philadelphia*, --- F.4th ----, 2024 WL 5453086, at *2 (3d Cir. Mar. 7, 2025). The Fourteenth Amendment protects pretrial detainees (and maybe arrestees) at least to the same extent as the Eighth Amendment protects convicted prisoners, so a pretrial detainee at least has an inadequate-medical-care claim when a state official is deliberately indifferent to the detainee's serious medical need. *Thomas*, 88 F.4th at 21.

But many Courts of Appeals have held that the Fourteenth Amendment goes further than the Eighth and requires that pretrial detainees be treated objectively reasonably. *See Short v. Hartman*, 87 F.4th 593, 604–11 & n.9 (4th Cir. 2023) (collecting cases). Under that standard, a pretrial detainee has an inadequate-medical-care claim when a state official "should have known" of her serious medical condition and "should have . . . acted accordingly." *Id.* at 611. It's unclear whether the Fourteenth Amendment objective-reasonableness standard would protect an arrestee to the same extent as the Fourth Amendment objective-reasonableness standard. *Compare id.* at 611–12 (observing that mere negligence does not violate due process), *with Currie,* 728 F.3d at 630 (suggesting that negligence violates the Fourth

16

Amendment). Because Jacobs has adduced no evidence that would allow a reasonable juror to return a verdict in her favor under any standard, the Court need not decide which one is proper.

The Court can assume *arguendo* that the account Jacobs gave in her deposition is true: She suffered a seizure at some unspecified time while in custody, the seizure caused her to urinate on and injure herself, and nobody at the Detention Unit ever offered any assistance despite her telling someone she didn't feel well and her daughter calling for help. (Jacobs Dep. 27:18–28:2, 29:2–22.) The Court can further assume that because nobody ever helped Jacobs, *someone* on duty at the Detention Unit violated her constitutional right to medical care. Summary judgment is nevertheless appropriate because Jacobs has adduced no evidence that would allow a factfinder to determine *who* violated her right.

The only evidence in the record concerning the Detention Unit Defendants is the assignment sheets showing that each was on duty for at least part of Jacobs's detention. *See* (Assignment Sheets.) But because there is no evidence suggesting *when* the seizure occurred, *see* (*id.* 28:3–5), a factfinder would have no way to determine which of the Defendants were on duty at the time. There is also no evidence concerning the Defendants' job duties or interactions with Jacobs. Thus, a reasonable juror would have no basis to conclude that any particular Defendant acted unreasonably, or with deliberate indifference, in response to Jacobs's medical needs. It's not enough that the record might "narrow[] the potential universe of actors" to those on duty;[9] Jacobs cannot proceed to trial against defendants whose "personal involvement in the alleged

---

[9] It's not even clear from the record that Jacobs has narrowed the universe of actors to the relevant group; she omitted several other Detention Unit officers who were on duty during the relevant period. *See* (Assignment Sheets.)

17

violation" is not supported by evidence. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 291 (3d Cir. 2018).

An appropriate Order follows.

BY THE COURT:

***/s/ Gerald J. Pappert***

Gerald J. Pappert, J.